**Robbie James LYONS, Petitioner,**

v.

**R.C. LEE, Warden, Central Prison, Raleigh, North Carolina, Respondent.**

**No. 1:00CV00108.**

United States District Court, M.D. North Carolina.

March 26, 2002.

J. Kirk Osborn, Osborn & Tyndall, P.L.L.C., Chapel Hill, NC, Ernest Lee Conner, Jr., Dixon Doub & Conner, Greenville, NC, for Robbie James Lyons.

Valerie B. Spalding, N.C. Dept. of Justice, Raleigh, NC, for R. C. Lee.

## O–R–D–E–R

BULLOCK, District Judge.

On January 18, 2002, in accordance with 28 U.S.C. § 636(b), the Recommendation of the United States Magistrate Judge was filed and notice was served on the parties in this action and a copy was given to the court.

Within the time limitation set forth in the statute, counsel for Petitioner objected to the Recommendation.

The court has appropriately reviewed the portions of the Magistrate Judge's report to which objection was made and has made a de novo determination which is in accord with the Magistrate Judge's report.

The court therefore adopts the Magistrate Judge's recommendation.

**IT IS THEREFORE ORDERED** that Petitioner's petition for writ of habeas corpus [Pleading no. 2] be **DENIED** and that this action be dismissed with prejudice. A judgment dismissing this action will be entered contemporaneously with this Order. A certificate of appealability is not issued, the court finding that no substantial issue is presented.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Robbie James Lyons, a North Carolina death row inmate, has filed in this court a habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 1994 state court conviction for first-degree murder. Lyons was given a sentence of death on the first-degree murder conviction. Lyons petitions this court for a writ of habeas corpus awarding him a new trial and/or sentencing hearing. Petitioner Lyons is represented in this habeas action by attorneys J. Kirk Osborn and Ernest L. Conner, Jr. Respondent R.C. Lee, the Warden of Central Prison ("the State"), is represented by the North Carolina Attorney General.

### THE STATE COURT PROCEEDINGS

On January 31, 1994, the Forsyth County Grand Jury indicted Petitioner Lyons—under the name Robbie James Lyons—on one count of attempted armed robbery and one count of first-degree murder, both of the person of Stephen Wilson Stafford. Lyons was tried capitally at the April 25, 1994 Criminal Session in Forsyth County, the Honorable William H. Freeman presiding. Lyons was represented by attorneys Danny T. Ferguson and Urs R. Gsteiger. On May 3, 1994, the jury found Lyons guilty of (1) first-degree murder under the

felony murder theory with the attempted armed robbery as the underlying felony, and (2) attempted armed robbery.

At the sentencing phase, the jury found as an aggravating factor that Lyons had been convicted previously of a felony involving the use or threat of violence. The State had introduced evidence of a 1993 conviction for common law robbery and a 1993 conviction for armed robbery to support the statutory aggravating factor.

The jury found the following statutory mitigating circumstances: (1) the murder was committed while Lyons was under the influence of a mental or emotional disturbance; and (2) the statutory catch-all mitigating circumstance. The jury found the following nonstatutory mitigating circumstances: (1) Lyons was emotionally abused as a child; (2) Lyons was abandoned by his mother as a child; (3) Lyons' psychological disorders were related to his mother's drug abuse; and (4) Lyons had a long history of alcohol and drug abuse.

On May 6, 1994, the jury recommended the death penalty for the first-degree murder conviction. The trial court imposed the death penalty and arrested judgment on the attempted armed robbery conviction. Lyons appealed to the North Carolina Supreme Court. On April 4, 1996, the Court affirmed Lyons' convictions and death sentence. *State v. Lyons*, 343 N.C. 1, 468 S.E.2d 204 (1996). On October 7, 1996, the United States Supreme Court denied Lyons' subsequent petition for a writ of certiorari. *Lyons v. North Carolina*, 519 U.S. 894, 117 S.Ct. 237, 136 L.Ed.2d 167 (1996).

On October 31, 1996, the Forsyth County Superior Court appointed J. Kirk Osborn and Ernest L. Connor, Jr. to represent Lyons for state post-conviction purposes. On April 14, 1997, Petitioner filed two Motions for Appropriate Relief (hereinafter MARs), one for the 1993

common law robbery conviction and one for the 1994 first-degree murder conviction. On September 26, 1997, Lyons filed a motion for the recusal of Judge Freeman. On January 8, 1998, Judge Freeman recused himself, and the cases were assigned to the Honorable Peter M. McHugh.

The state court held evidentiary hearings on March 6, and April 27, 1998. On June 11, 1998 the court denied both MARs. On August 7, 1998, Lyons filed a petition for certiorari review in the North Carolina Supreme Court, but the court denied certiorari review on August 19, 1999. On November 15, 1999, Petitioner filed two petitions for certiorari review (one from the 1993 common law robbery conviction and one from the 1994 first-degree murder conviction) in the United States Supreme Court. On January 18, 2000 the Court denied both petitions.

On January 28, 2000 Petitioner filed two petitions for writ of habeas corpus in this court, one challenging his 1993 common law robbery conviction and one challenging his 1994 first-degree murder conviction and death sentence. By separate Recommendation filed today, the court has recommended dismissal of the petition relating to the 1993 common law robbery conviction on the ground that the court lacks jurisdiction because Petitioner is no longer in custody for that conviction. The petition relating to the 1994 first-degree murder conviction is now before the court for a ruling.

## THE CLAIMS OF THE HABEAS CORPUS PETITION

Petitioner Lyons presents the following 21 claims in his habeas petition:

I. Petitioner's death sentence was unconstitutional because it was based in part on an uncon-

stitutional and invalid prior conviction for common law robbery.

II. Petitioner's writings were admissible and relevant mitigating evidence and the court committed reversible constitutional error by preventing the jury from considering them.

III. The trial court violated Petitioner's due process rights by failing to permit Petitioner to question prospective jurors concerning their conceptions of parole eligibility on a life sentence for first-degree murder.

IV. Petitioner's death sentence was unconstitutional because the trial judge refused to allow defense counsel to question jurors as to their understandings of a sentence of life imprisonment.

V. The trial court denied Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by restricting his opportunity to conduct an adequate jury voir dire.

VI. Petitioner's right to be tried by a jury selected without regard to race was violated by the State's discriminatory use of peremptory challenges against potential jurors of minority descent where the prosecutor used five of the eleven peremptory challenges to excuse five of seven minority jurors, where the court's *Batson* ruling on the first three minority jurors the prosecutors excused was clearly erroneous, and where the court's findings on Petitioner's *Batson* objections were inadequate as a matter of law.

VII. The trial court committed constitutional error by failing to submit per N.C. Gen.Stat. § 15A–2000(f)(6) the statutory mitigating circumstance that Petitioner's capacity to conform his conduct to the requirements of the law was impaired.

VIII. The trial court committed constitutional error by refusing the defendant's request for a peremptory instruction on the statutory mitigating circumstance that the offense was committed while Petitioner was under the influence of a mental or emotional disturbance.

IX. The trial court committed constitutional error by instructing the sentencing jury that it must be unanimous in its answer on sentencing issue IV, contrary to North Carolina law and in violation of the Eighth and Fourteenth Amendments.

X. The trial court's instructions defining the burden of proof applicable to mitigating circumstances violated the Fifth, Sixth, Eighth, and Fourteenth Amendments because they used the inherently ambiguous and vague terms "satisfaction" and "satisfy" to define the burden of proof, thus permitting jurors to establish for themselves the legal standard to be applied to the evidence.

XI. The trial court's instructions permitted jurors to reject submitted mitigation on the basis that it had no mitigating value in violation of the Fifth, Sixth,

Eighth, and Fourteenth amendments.

XII. The trial court's use of the term "may" in sentencing Issues Three and Four made consideration of proven mitigation discretionary with the sentencing jurors, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

XIII. The trial court violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments by denying Petitioner the right to examine each juror challenged by the State during death qualification prior to their excusal and by excusing jurors Petitioner was not permitted to question.

XIV. Petitioner's death sentence was unconstitutionally obtained because his trial counsel failed to develop and present available mitigating evidence.

XV. Petitioner's conviction for first-degree murder and [the resulting] death sentence were unconstitutional because they were based in part on the State tendering testimony of the co-defendant which the State knew to be false.

XVI. The trial court committed constitutional error by permitting the State to cross-examine Petitioner's psychologist, who admitted that Petitioner suffered from a mood disorder characterized in part by explosiveness, concerning an incident in which he had attacked a prison guard during a prior incarceration, where Petitioner had not put Petitioner's adjustment to prison in issue, had not raised an issue concerning Petitioner's good character, and where the court did not limit the jury's use of the evidence on the basis of the doctor's opinion.

XVII. The trial court committed constitutional error by instructing the jury to consider, as one of two convictions potentially supporting the aggravating circumstance of prior conviction for a violent felony, Petitioner's conviction for robbery with a dangerous weapon, where the conviction for robbery with a dangerous weapon occurred after Petitioner's alleged commission of the offense in the case at bar, and was therefore not competent to prove the aggravating circumstance as defined at N.C. Gen.Stat. § 15A-2000(e)(3).

XVIII. The court's failure to prevent the improper and inflammatory argument of the prosecutor in the penalty phase denied Petitioner due process of law, the right to be free of cruel and unusual punishment, and the right to the assistance of counsel.

XIX. Petitioner's conviction and death sentence were unconstitutionally obtained because his counsel failed to establish a relationship of trust with him.

XX. Petitioner's conviction and death sentence were unconstitutionally obtained because trial counsel conceded Petitioner's guilt to felony murder and attempted armed robbery in counsel's opening statement.

XXI. Petitioner's conviction and death sentence were unconstitutionally obtained because the trial court failed to hold a hearing on Petitioner's competency.

## THE EVIDENCE PRESENTED AT TRIAL

The North Carolina Supreme Court summarized the evidence presented at Petitioner's trial as follows:

Stephen Stafford, the victim, owned a small business known as Sam's Curb Market (hereinafter referred to as "Sam's") in Winston–Salem, North Carolina. At trial, the State presented evidence tending to show that on 25 September 1993, Stafford was shot and killed in his place of business. Victoria Lytle witnessed the shooting.

Lytle testified that early in the afternoon of 25 September 1993, she drove to Sam's and parked directly in front of the market. As Lytle got out of her car, she noticed two men across the street. Lytle went into the store, collected her purchases, and then remembered that she needed some diet soda. Lytle went to the store's cooler. At that time, one of the men, Derick Hall, entered the store. As Lytle approached the counter, Hall told her to go ahead of him and pay for her items, but Lytle told him to go ahead of her instead. While waiting for Hall to pay for his purchases, Lytle noticed the defendant standing outside and looking into the store. Lytle then paid for her purchases, said goodbye to the victim and left the store.

Lytle further testified that she heard three gunshots as she closed her car door. At the time the shots were fired, Lytle was approximately three feet from the store. Lytle stated that upon hearing the shots she looked up and saw a flash. She then heard the victim moan and saw him fall forward over the counter and then backward to the floor. Lytle testified that immediately after she heard the shots and saw the victim fall, she saw the defendant run out of the store with a gun in his hand.

Derick Hall, the defendant's accomplice, testified for the State that he had a long-barreled .22–caliber gun on the morning of Mr. Stafford's murder. Hall stated that when he and the defendant went to Sam's, the defendant had possession of the gun. Hall testified that as he and the defendant approached Sam's, the defendant told him that he needed money and was going to rob the store. Hall did not believe the defendant was serious. After Victoria Lytle left the store, the defendant entered and told the victim to freeze and turn around. Hall also obeyed the command in order to demonstrate that he had no part in the robbery. Hall testified that he then heard five shots, and when he turned around, the defendant was gone and the victim was lying on the floor. Hall further testified that the victim was grunting in an effort to speak and that the victim reached up and pushed the burglar alarm before collapsing back on the floor. The next evening, Hall voluntarily turned himself in to the police.

Dr. Patrick Lantz, a forensic pathologist, performed an autopsy on the victim's body on 26 September 1993. Dr. Lantz testified that one bullet entered the victim's left hand and was recovered from the victim's wrist. This wound was consistent with the victim's having grasped the gun and would not in itself have been fatal. Two more bullet fragments were discovered in the victim's upper arm. These bullet fragments fractured the humerus and caused considerable splintering of the bone. This wound would similarly not have been

fatal in the short term. Finally, Dr. Lantz testified that the victim had been shot in the back and that bullet went into the victim's chest through the lung and aorta. Dr. Lantz testified that this bullet wound caused the victim to bleed to death.

Special Agent Ronald Marrs, an expert in the field of firearms identification, testified that two of the bullets recovered from the victim's body were .22–caliber. The two fragments were too deformed to yield a result. Although made by different manufacturers, the bullets were all consistent with having been fired from a .22–caliber weapon.

The defendant offered no evidence during the guilt/innocence phase of the trial.

At the penalty phase of the trial, the State presented evidence supporting the submission of the aggravating circumstance that the defendant had previously been convicted of a felony involving the use or threat of violence to the person. This evidence tended to show that the defendant had been convicted of two prior felonies, one of which was an armed robbery, and one of which was a common law robbery.

The defendant's evidence consisted of testimony from Dr. Gary Hoover, an expert in the field of psychology. Dr. Hoover testified that he conducted a forensic psychological evaluation of the defendant which included interviews with eleven individuals and records from nine sources covering defendant's history as far back as age eight. Dr. Hoover also interviewed the defendant twice at Central Prison. Dr. Hoover diagnosed defendant as suffering from bipolar disorder, antisocial personality disorder and substance abuse.

*State v. Lyons,* 343 N.C. 1, 9–11, 468 S.E.2d 204, 206–08 (1996), *cert. denied,* 519 U.S. 894, 117 S.Ct. 237, 136 L.Ed.2d 167 (1996).

## THE HABEAS CORPUS STANDARD OF REVIEW

The Supreme Court of the United States has recently clarified the habeas corpus standard of review:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring.)

> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its inde-

pendent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411, 120 S.Ct. 1495.

### CLAIM I

As his first habeas claim, Petitioner challenges the validity of his 1994 death sentence as enhanced by his 1993 common law robbery conviction. The 1993 conviction was used in the sentencing phase of his first-degree murder trial as one of two prior felonies to support the finding of the statutory aggravating circumstance under N.C. Gen.Stat. § 15A–2000(e)(3), that Petitioner "had been previously convicted of a felony involving the use or threat of violence to the person." Petitioner contends that the 1993 common law robbery conviction was invalid and his 1994 death sentence was therefore based on an invalid statutory aggravating factor.

The United States district courts have jurisdiction to entertain petitions for habeas relief only from persons who are "*in custody* in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3) (emphasis added); *see also* 28 U.S.C. § 2254. Courts have interpreted this statutory language to mean that the habeas petitioner must be "in custody" under the conviction or sentence under attack at the time of the petition. *Maleng v. Cook,* 490 U.S. 488, 492, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989). Even though Petitioner is no longer in custody for the 1993 common law robbery conviction, this court has jurisdiction to consider the claim that his 1994 sentence (for which he is in custody) was improperly enhanced by the 1993 conviction. *See generally Maleng,* at 493–94, 109 S.Ct. 1923. However, the scope of the court's review of the 1993 conviction is extremely limited.

The United States Supreme Court recently held that

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, [a § 2254 petitioner] generally may not challenge the enhanced sentence ... on the ground that the prior conviction was unconstitutionally obtained.

*Lackawanna County Dist. Attorney v. Coss,* 532 U.S. 394, 121 S.Ct. 1567, 1574, 149 L.Ed.2d 608 (2001) (citations omitted). An established exception to this rule is that a petitioner may challenge an enhanced sentence where the conviction used to enhance the sentence was obtained in violation of the petitioner's Sixth Amendment right to counsel as recognized in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Custis v. United States,* 511 U.S. 485, 496–97, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). A further, rare exception may arise under *Lackawanna* if a petitioner can show that the state impeded his ability to obtain direct or collateral review of his underlying conviction or if he can show compelling evidence of actual innocence, which evidence was obtained only after the completion of the time for state court review. *Lackawanna,* 121 S.Ct. at 1575 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.). These "Lackawanna" exceptions are limited to circumstances wherein the habeas proceedings are "effectively ... the first and only forum available for review of the prior conviction." *Id.* Accordingly, under *Lackawanna,* this court may not reach the question of whether Lyons' 1993 conviction was unconstitutionally ob-

tained unless Lyons can meet one of these narrow exceptions.

Lyons cannot meet the "lack of counsel" exception because he was in fact represented by counsel in the 1993 proceeding that resulted in his guilty plea to common law robbery. Furthermore, Lyons does not argue and indeed cannot show that the State in any way impeded him from seeking review of his 1993 common law robbery conviction. (In fact, he sought MAR review, but his claims were denied on the merits.) Lyons does argue that he was "actually innocent" of the crime of common law robbery. Accordingly, the court will address his "actual innocence" argument.

Petitioner Lyons was originally charged with armed robbery under N.C. Gen.Stat. § 14–87. However, he was allowed to plead guilty to common law robbery pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[1] The United States Supreme Court has stated that when a petitioner has pleaded guilty under *Alford*, in order to show "actual innocence" for habeas corpus purposes, he must show that he was factually innocent of the crime he pleaded to *and* the more serious charge originally brought by the State. *Bousley v. United States*, 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). The *Bousley* Court stated that, in the context of habeas corpus review,

[I]t is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency. In other words, the Government is not limited to the existing record to rebut any showing that petitioner might make. Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered before our decision in *Bailey*. In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges.

*Bousley*, at 623–24, 118 S.Ct. 1604 (citations omitted). Accordingly, for this court to address Lyons' claim on the merits, he must show that he was "actually innocent" of not only common law robbery, but also of the foregone, original charge of armed robbery.[2] This he has failed to do for the reasons stated below.

Petitioner's guilty plea to common law robbery resulted from events that occurred on Stratford Road in Winston–Salem on June 23, 1993. The MAR court made the following findings regarding the June 23, 1993 Stratford Road crime:

Valerie Hutchinson, a schoolgirl, testified that on the evening of 23 June 1993, she and some friends were standing talking in the parking lot of a local res-

---

**1.** In *Alford*, the United States Supreme Court held that a state court may accept a guilty plea accompanied by a defendant's claim of innocence as long as the record before the judge contains a "strong factual basis" for the plea. *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**2.** Petitioner argues that *Bousley* is not applicable because the "actual innocence" standard in that case was announced in the context of a request for relief from a procedural

default. The court does not agree that *Bousley* is so limited in application. The paramount concerns about finality that underlie the *Bousley* and other rulings on procedural default are the very concerns discussed in *Lackawanna* that call for restrictions on the review of underlying convictions used to enhance later sentences. *See Lackawanna*, 121 S.Ct. at 1573–74. *See also Daniels v. United States*, 532 U.S. 374, 121 S.Ct. 1578, 1582–83, 149 L.Ed.2d 590 (2001).

taurant. A car with four men in it drove by and parked. The men got out. Several of Hutchinson's friends saw that the men had a gun. They [Hutchinson's friends] said, "Gun" and began to run towards their cars. Hutchinson did not hear them and continued to talk to one of her friends. The men then approached Hutchinson; one began to talk to her when another one of them came up to her, put a gun to her head and told her to give him all her money. Hutchinson, although scared, looked at him and began to walk away. The men yelled after her, "Do you think we're fucking playing, bitch[?]" Hutchinson kept on walking, got into her friend's car and they drove away. They went to an Amoco station, where they met their other friends who had called the police for them. The police officers arrived shortly thereafter. Hutchinson identified a photograph of [Petitioner] as one of the men in the parking lot, although he was not the man with the gun. [Petitioner] was the man who first approached Hutchinson.

Brooke Fogg, another schoolgirl, was also at Stratford Road with Hutchinson and other friends. She stated that she saw a burgundy car drive up and four men get out. One of the men pulled a gun. The young people began to run. Fogg identified [Petitioner] as one of the men in the burgundy car. Kimberly Hill, also a schoolgirl, corroborated Fogg's testimony and identified [Petitioner] as one of the men in the burgundy car.

Officer B.K. Adams of the Winston–Salem Police Department testified that he received a call that an armed robbery had taken place on Stratford Road. He responded to the Amoco station, where he received information that the car car-

rying the four black male perpetrators was a burgundy Pontiac. Based on information received, Adams then went to a nearby Burger King where he saw the burgundy car and four black males. He then followed them to the same Amoco station where they were apprehended. [Petitioner] identified himself as Robby Johnson. (Adams found out later that [Petitioner's] real name was Robbie Lyons). Adams searched the burgundy car, and found what appeared to be a large caliber semi-automatic pistol. This later turned out to be a CO–2 pellet pistol. For a short distance, the muzzle velocity is similar to that of a .22 caliber long rifle.

(State's Br., Ex. V, Mem. Order and Final Op., at 18–19, ¶ 20.) The court presumes that these findings of fact are correct and Petitioner has offered no evidence to rebut the findings. 28 U.S.C. § 2254(e)(1).

The State originally charged Petitioner with armed robbery under N.C. Gen.Stat. § 14–87. Pursuant to the advice of defense counsel Pete Clary, and in response to a plea offer from the prosecutor, Petitioner pleaded guilty to common law robbery and was sentenced to three years supervised probation. The sentencing court was not aware that Petitioner had used an alias when arrested and that he had a prior criminal record, including an outstanding arrest warrant for an armed robbery of a Kentucky Fried Chicken restaurant. The plea agreement was greatly to Petitioner's benefit, as he was able to avoid the prospect of a mandatory-minimum sentence of seven years for armed robbery in exchange for a common law robbery conviction that resulted in unsupervised probation. *See* N.C. Gen.Stat. § 14–87(d) (1993) (seven-year active minimum sentence for armed robbery).[3]

---

3. In 1993, armed robbery was a Class D felo- ny, and carried a sentence of up to forty years

■ About two months after Petitioner pleaded guilty to common law robbery, he committed the first-degree murder that led to the death sentence he now challenges. The common law robbery conviction was used in the sentencing phase of his first-degree murder trial as one of two prior felonies to support the finding of the statutory aggravating circumstance under N.C. Gen.Stat. § 15A–2000(e)(3), that Petitioner "had been previously convicted of a felony involving the use or threat of violence to the person." Petitioner subsequently challenged both the common law robbery conviction and the first-degree murder conviction in state court MAR proceedings. In those proceedings, it was revealed that no property was taken from the victims of the Stratford Road incident. The elements of common law robbery in North Carolina include (1) the felonious, non-consensual taking of (2) money or personal property (3) from the person or presence of another (4) by means of violence or fear. *State v. Smith,* 305 N.C. 691, 700, 292 S.E.2d 264, 270, *cert. denied,* 459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982). Accordingly, one of the elements of common law robbery, a felonious taking, was not present. (State's Br., Ex. P3, Tr. of MAR Hearing, at 11.)

■ At the same time, however, the MAR court found that the State had strong evidence of Petitioner's guilt to the more serious, original charge of armed robbery under N.C. Gen.Stat. § 14–87. An armed robbery under N.C. Gen.Stat. § 14–87 occurs when an individual takes or *attempts to take* personal property from the person of another, or in his presence, by the use or threatened use of a dangerous weapon, whereby the life of a person is

endangered or threatened. *State v. Hunt,* 297 N.C. 447, 255 S.E.2d 182 (1979) (emphasis added). Accordingly, in contrast to common law robbery, the offense under N.C. Gen.Stat. § 14–87 is complete even if no property is taken from the victim. Thus, the failure to take property from another is no defense to armed robbery under § 14–87. *See State v. White,* 322 N.C. 506, 369 S.E.2d 813 (1988) (purpose of § 14–87 was to increase the punishment for common law robbery when firearms or other dangerous weapons were used to commit a robbery, whether or not the robber succeeded in the effort to take personal property).

■ Petitioner contends, however, that he was not guilty of the foregone original charge of armed robbery under N.C. Gen.Stat. § 14–87 because he was merely a bystander in the Stratford Road crime. He contends that he did not know that his co-defendant Steele had a pellet pistol and in any event the pellet pistol was not functional. These arguments fail. In North Carolina, all who are present at the place of a crime and are either aiding, abetting, assisting, or advising its commission, or are present for such purpose to the knowledge of the actual perpetrator, are principals and equally guilty. *State v. Dowd,* 28 N.C.App. 32, 220 S.E.2d 393 (1975). The MAR court found as a fact that

> With regard to the Stratford Road incident, the evidence presented at the murder trial indicates that defendant was the first out of the car and the first to approach the victim, Valerie Hutchinson. He stood with Scottie Steele when Steele produced the gun and threatened Hutchinson. As Hutchinson walked

imprisonment or a fine or both. N.C. Gen. Stat. § 14–1.1(4) (1993). A person convicted of armed robbery was required to serve a sentence of not less than seven years impris-

onment, excluding gain time. The sentence could not be suspended and the sentenced person could not be placed on probation. N.C. Gen.Stat. § 14–87(d)(1993).

away, both men yelled at her, 'Do you think we're fucking playing; bitch[?]' Immediately thereafter, the men ran back to Tracy Smith's car and fled the scene.

(State's Br., Ex. V at 24, ¶ 3; State's Br., Ex. A5, Tr. of Sentencing Phase Vol. IV at 28.) The court presumes that these findings of fact are correct. Petitioner has not offered clear and convincing evidence to rebut these findings. 28 U.S.C. § 2254(e)(1). Accordingly, the evidence simply does not show that Lyons was merely a bystander during the armed robbery. To the contrary, this specific finding by the MAR court, seen in the context of all of the evidence concerning the armed robbery, constitutes strong evidence that Petitioner participated in the armed robbery. Furthermore, the fact that the pistol may not have been functioning properly does not preclude it from being a "dangerous weapon" for purposes of § 14–87. Whether an instrument can be a dangerous weapon depends on the nature of the instrument, the manner in which the defendant used it or threatened to use it, and in some cases the victim's perception of the instrument. *State v. Peacock,* 313 N.C. 554, 330 S.E.2d 190 (1985). *See State v. Joyner,* 67 N.C.App. 134, 312 S.E.2d 681 (1984), *aff'd,* 312 N.C. 779, 324 S.E.2d 841 (1985) (purpose of N.C. Gen.Stat. § 14–87(a) would be frustrated or defeated if court accepted defendant's contention that in absence of a firing pin a rifle was not a firearm under this section; a robbery victim should not have to force the issue of whether an instrument actually possesses a firing pin, whether an instrument is loaded, or whether an instrument is real). North Carolina courts have stated that where there is evidence that an instrument used in a robbery appeared to be a firearm capable of endangering or threatening the life of the victim, and there is also evidence that the instrument was either a cap pistol

or an inoperative firearm, it is for the jury to determine the nature of the weapon. *State v. Allen,* 317 N.C. 119, 343 S.E.2d 893 (1986). Here, the MAR court found that Hutchinson testified that Steele put a gun to her head and told her to give him all the money. The court also found as fact from an officer's testimony that for a short distance, the muzzle velocity of a CO–2 pellet pistol is similar to that of a .22 caliber long rifle. The court presumes that these findings are correct and Petitioner has offered no evidence to rebut the findings. 28 U.S.C. § 2254(e)(1). Thus, Petitioner's argument that the pistol could not be a "dangerous weapon" under § 14–87 fails.

Finally, Petitioner cannot meet the "actual innocence" exception under *Lackawanna* for another reason. The *Lackawanna* "actual innocence" exception calls for "compelling evidence ... which [the petitioner] *could not have uncovered in a timely manner.*" *Lackawanna,* 121 S.Ct. at 1575 (emphasis added). The evidence upon which Petitioner relies to argue that he was actually innocent of armed robbery under § 14–87 was available well before the completion of the time for state court review.

In sum, Petitioner has failed to show that he was actually innocent of the more serious, foregone charge of armed robbery under N.C. Gen.Stat. § 14–87. Accordingly, Lyons has no cognizable claim of "actual innocence" despite his argument that there was no factual basis for one element of the common law robbery charge to which he pleaded guilty. *Bousley,* 523 U.S. at 623–24, 118 S.Ct. 1604. Under these circumstances, Petitioner's assertion of "actual innocence" in order to fall within the *Lackawanna* exception is to no avail. Thus, this court may not address the merits of Petitioner's claim that the

1993 common law robbery conviction was unconstitutionally obtained.

██ Petitioner also argues that his trial counsel were ineffective because they failed to investigate the prior common law robbery conviction to confirm whether that conviction was valid. Nonetheless, the MAR court's determination that the conviction was valid turns on determinations of state law that this court must respect. Certainly, the MAR court's determination that trial counsel were not ineffective includes no unreasonable application of clearly established federal law, as there was no Supreme Court authority that was inconsistent with the reasoning of *Bousley* or stood for the proposition that a plea to a lesser offense as a part of a plea agreement is constitutionally invalid due to the absence of evidence to support an element of the lesser offense, where there is evidence to support every element of the original, foregone charge. Accordingly, Petitioner cannot make out a claim of ineffective assistance of his trial counsel for not challenging the common law robbery conviction.

For the reasons set forth above, Petitioner's Claim I does not entitle him to habeas corpus relief.

### CLAIM II

In Claim II of the Petition, Petitioner contends that the trial court committed constitutional error by refusing to admit as mitigating evidence certain poetry and essays allegedly written by Petitioner.

At the sentencing phase of Petitioner's first-degree murder trial, Petitioner's counsel called psychologist Dr. Gary Hoo-

ver to the stand. Petitioner's counsel asked Dr. Hoover to identify a series of poems and writings allegedly written by Petitioner.[4] The State objected and defense counsel attempted to lay a foundation for the introduction of the writings into evidence. (State's Br., Ex. A5 at 66.) Dr. Hoover testified that he had not used the writings to form his opinion as to the Petitioner's specific psychiatric diagnoses, but that the writings lent "a great deal of understanding to the life of [the Petitioner]" and were part of his "ultimate" opinion. *Id.* at 67. The trial judge stated that he would allow the writings into evidence but that the jury could not read them and Petitioner's counsel could not mention them during closing arguments. *Id.* at 69–70. The judge further stated, however, that defense counsel *could* present to the jury any writings that Dr. Hoover had used specifically to form a basis for his opinion. *Id.* at 70. Petitioner's counsel subsequently did not attempt to introduce any part of the writings to the jury.

██ The United States Supreme Court has held that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant's character, record, or the circumstances of the particular offense. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In this case, Petitioner apparently wanted to introduce the writings as mitigating evidence of Petitioner's character to show that he expressed remorse for killing Stephen Stafford or to "humanize" Petitioner generally by showing that he grew up in a crime-infested,

---

**4.** The State argues that the writings were not reliable because Petitioner laid no foundation to show that he authored the writings. In an affidavit submitted in his MAR proceedings, Petitioner. stated that the writings were copies of his poetry. He stated that he had written poetry all of his life and that he signed his name "Lord Insane" to the poetry because it is his nickname. He further stated that he wrote the poetry while in jail and he gave it to Dr. Hoover and his trial attorneys.

poverty-stricken neighborhood. Petitioner does seem to express general remorse for his "mistakes" and "sins" in at least one of his poems:

A wise man learns from his mistakes/I've learned and realized/And I've opened my eyes/And acknowledged that my mistake was great/By this mistake I often regret/And many times my eyes became wet/And to God I have often prayed/To take away my sins/And to make me whole again/Because only God knows how much I am afraid.

(State's Br., Ex. L, Petitioner's MAR at Tab 6.) However, in the same poem Petitioner writes:

I'm just one of the many, that was led astray/But has what I've done is so wrong/To make everyone's ill feeling so strong/To make you want to take my life away.

This part of the poem seems to indicate that Petitioner minimizes the gravity of his actions. In fact, he does not mention his victim's name or otherwise refer to the 1993 murder once in the series of poems and essays.

Other poems demonstrate an utter *lack* of remorse and an intent to repeat his criminal behavior. In a poem titled "The Jungle Creed Is My Creed," Petitioner writes:

As a beast I know no sin/And as a beast I know I don't have any friend/Because this is the jungle and the beasts decree/Yeah the Jungle creed/Said the strong must feed/on any prey at hand/So branded as beast/I sat down at the feast/Already knowing that my prey is man/So all take heed/As a beast I upholds this creed/Straight from the start/I would never change/Because to me it would be so strange/So forever I'll stay a beast in soul and heart.

In a cage of iron & stone/In the jungle I no longer roam/But I will again one day/That day may be long/And all I'm going to do is get real strong/Until I once again have you all as my prey.

*Id.* The court finds no imaginable mitigating qualities in this poem. Another poem, titled "Children of the Ghetto," in which Petitioner writes about an abused and abandoned child, is arguably mitigating in the broadest sense. However, it is not clear that Petitioner is writing from personal experience because the entire poem is written in the third person. In any event, this mitigating evidence would merely be cumulative because the jury found as a mitigating circumstance that Petitioner was abused as a child and abandoned by his mother.

After a careful review of the essays and poetry, the court finds that these writings lack significant mitigating force not provided by other evidence offered by Petitioner, and, if admitted into evidence, may very well have detracted from counsel's attempt to humanize Petitioner. The court further notes that the trial court ruled that Petitioner *could* show to the jury any part of the writings on which Dr. Hoover relied in his diagnosis, but Petitioner's counsel chose—perhaps wisely—not to ask Dr. Hoover about specific writings or their effect on his opinions.

Accordingly, the trial court's exclusion of the writings in this case was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Buchanan v. Angelone,* 103 F.3d 344, 348–49 (4th Cir.1996), *aff'd,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *Huffington v. Nuth,* 140 F.3d 572 (4th Cir.), *cert. denied,* 525 U.S. 981, 119 S.Ct. 444, 142 L.Ed.2d 399 (1998). Even if this court were to conclude that the trial court committed error in preventing the jury from seeing all of Petitioner's alleged writ-

ings, it is abundantly clear that the error did not have a substantial or injurious effect on the jury's determination that Petitioner should be sentenced to death. *Cf. Boyd v. French,* 147 F.3d 319, 327 (4th Cir.1998), *cert. denied,* 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999). Petitioner conceded at trial that he killed Stephen Stafford while attempting an armed robbery. He had previously committed another armed robbery and a common law robbery. His attorney presented the available evidence about Petitioner being abused and abandoned as a child and suffering from psychological conditions. There is simply no shred of possibility that the jury could have been influenced in Petitioner's favor and in its sentencing recommendation had it been permitted to view the poetry allegedly written by Petitioner.

For the reasons set forth above, the court finds that Petitioner's Claim II is without merit.

### CLAIM III

In Claim III of the Petition, Petitioner contends that the trial court violated his due process rights by failing to permit him to question prospective jurors about their conceptions of parole eligibility on a life sentence for first-degree murder. This claim was raised and rejected on direct review.

■■■ The record shows that Petitioner would have been eligible for parole if he had received a life sentence. The United States Supreme Court in *Simmons* held that where a defendant is *ineligible* for parole and the prosecutor argues future dangerousness, Due Process entitles the defendant to inform the jury that he is ineligible for parole. *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). However, *Simmons* did not recognize a constitutional Due Pro-

cess right for a defendant to question jurors about parole eligibility in cases in which the defendant is *eligible* for parole. The *Simmons* Court expressly stated, "[I]n a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact." *Simmons,* 512 U.S. at 176, 114 S.Ct. 2187.

Accordingly, the court finds that the state court's decision denying this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See Keel v. French,* 162 F.3d 263 (4th Cir.1998) ("We have repeatedly rejected attempts to expand the *Simmons* rule to apply to prisoners who are eligible for parole."), *cert. denied,* 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999). *See also Joseph v. Angelone,* 184 F.3d 320 (4th Cir.) (holding that the Due Process clause did not entitle Petitioner to inform the jury that although he would be eligible for parole if a life sentence were imposed he would not be eligible for a number of years), *cert denied,* 528 U.S. 959, 120 S.Ct. 392, 145 L.Ed.2d 305 (1999); *Roach v. Angelone,* 176 F.3d 210 (4th Cir.) (same), *cert. denied,* 528 U.S. 965, 120 S.Ct. 401, 145 L.Ed.2d 313 (1999).

For the reasons set forth above, the court finds that Petitioner's Claim III is without merit.

### CLAIM IV

In Claim IV of the Petition, Petitioner contends that his death sentence was unconstitutional because the trial judge refused to allow defense counsel to question prospective jurors as to their understandings of a sentence of life imprisonment. Here, Petitioner merely restates Claim III and asserts the same argument under *Simmons.* For the reasons set forth in

the discussion of Petitioner's Claim III above, the court finds that Petitioner's Claim IV is without merit.

### CLAIM V

In Claim V of the Petition, Petitioner contends that the trial court denied Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by restricting his opportunity to conduct an adequate jury *voir dire*. Nonetheless, Petitioner's "Corrected Brief" (Pleading no. 17) contains no argument on Claim V, but relies wholly on the petition. In any event, Petitioner has articulated no basis for this claim, and the court's review reveals none. Generalized and conclusory allegations of impairment of defense counsel's ability to conduct a meaningful *voir dire* will not suffice. Claim V should be dismissed.

### CLAIM VI

In Claim VI of the Petition, Petitioner contends that the prosecutor violated *Batson v. Kentucky* by using peremptory challenges to strike three minority jurors from the jury panel because of their race. Petitioner contends (A) that the evidence was insufficient to support the prosecutor's stated reasons for the strike; and (B) that the trial court did not apply the third prong of the *Batson* analysis.

A. Evidence Insufficient to Support the Findings

After examining the first twelve jurors called, the State peremptorily challenged three minority jurors: Zandra Segers, Patsy Hairston, and Sandra Clavijo. (Docket no. 8, Ex A2, Tr. of jury selection Vol. I at 21, 105.) Petitioner raised a *Batson* objection to the challenges. *Id.* at 106. The court asked the prosecutor to explain why he excused the three minority jurors. This court repeats the North Car-

olina Supreme Court's recital of the explanations:

> With regard to prospective juror Segers, the prosecutor provided the following explanation:

> > Judge, we felt that Ms. Segers in her response to the death penalty questions, she stated that the death penalty was simply an option and that [we] felt that she was not absolutely unequivocal on her ability to impose the death penalty. That she leaned her body language that she was leaning away from the entire jury selection process.... [H]er body language was the worst of any of the jurors as she was leaning away trying to get as far away from the table as possible. Then she had no responses to the group questions when we would ask questions of the group. That she would just remain silent and not participate in the selection.

> With regard to prospective juror Hairston, the prosecutor explained:

> > Your Honor, we noted that on Ms. Hairston's juror questionnaire that she was ... a nurse. That ... we did not want those folks with an absolute nurturing type of personality. We also note that she didn't understand on literally every question that we asked that all other eleven jurors answered almost immediately [and] she was evasive in her answers. She had difficulty following the questions and that she repeatedly asked me to repeat the questions. That at the first time that I talked about whether one could sign their name on the death penalty verdict, she looked shocked .... That when we tried to explain things to her, she looked puzzled and she couldn't apparently understand when I talked about some of the is-

sues that some of the other jurors were able to grasp.

Finally, with regard to prospective juror Clavijo, the prosecutor explained:

> Judge, we felt that she—on her questionnaire she put that she had only been employed for four months and that she had only lived in this county for four months. That she was single. That she had not voted in an election since 1989. We felt that she didn't have a sufficient stake in the community to warrant for the State sitting on a death penalty case.

*State v. Lyons*, 343 N.C. 1, 12–13, 468 S.E.2d 204, 208–09 (1996). After counsel gave their explanation, the trial court made the following verbal finding:

> Well, the Court will find that based on the questions asked and the jurors interviewed, the defendant has failed to establish a prima facie pattern of discriminatory use of challenges on behalf of the district attorney but out of an abundance of caution the Court has asked the district attorney to articulate reasons and the district attorney has articulated valid reasonable and satisfactory reasons for his use of challenges which are totally aside from race and the Court will deny the challenge under *Batson*.

(State's Br., Ex. A2 at 110–11.)

Petitioner contends that the record does not support the prosecutor's explanations for why he struck jurors Segers and Hairston. Specifically, Petitioner contends that the record shows that juror Segers' responses to death qualification were "unequivocal" and the "prosecutor's assertion that she was not responsive to group questions is unsupported by the record." Petitioner further contends that the record discloses that juror Hairston was not confused or incapable of comprehending the questions. Petitioner contends that juror Hairston, "was clear on what the prosecu-

tor was asking, her answers were clear and direct. . . . In no instance was Ms. Hairston 'evasive.'" (Petitioner's Corrected Br. at 24–27.)

Under 28 U.S.C. § 2254(d)(2), an application for a writ of habeas corpus shall not be granted unless the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Thus, this court may not grant relief as long as the state court's decision is determined to have been a reasonable determination of facts in light of the evidence and as long as the decision was not contrary to or an unreasonable application of clearly established law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d). Furthermore, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant [for habeas relief] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

 The United States Supreme Court in *Batson v. Kentucky* set forth a three-step evidentiary framework for evaluating claims of racial discrimination in jury selection. 476 U.S. 79, 93–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges in a racially discriminatory manner. *See id.* at 96–97, 106 S.Ct. 1712. Second, if the defendant has made a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97, 106 S.Ct. 1712. The prosecutor must then give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges. *Id.* at 98 n. 20, 106 S.Ct. 1712. Yet the explana-

tion "need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. 1712. The second step of this process does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). The trial court then must determine if the defendant has established purposeful discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. The defendant at all times bears the ultimate burden of persuasion as to the existence of purposeful discrimination.

■■■ In addition, *Batson* cautions that "great deference" should be given to the trial judge's determination that the peremptory strike was not racially motivated. *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712. Deference is particularly warranted where the proffered race-neutral explanation centers on the juror's "body language" and "mannerisms" that signaled inattentiveness, behaviors that are especially given to on-the-spot interpretation by the trial judge. *United States v. Cordoba–Mosquera,* 212 F.3d 1194, 1197 (11th Cir.2000), *cert. denied,* 531 U.S. 1131, 121 S.Ct. 893, 148 L.Ed.2d 800 (2001); *United States v. Hinton,* 94 F.3d 396, 397 (7th Cir.1996); *Caldwell v. Maloney,* 159 F.3d 639, 649 (1st Cir.1998) ("The conclusion of the federal district court that juror 4–1 was not equivocating, or was just being thoughtful, gives insufficient weight to considerations of body language, intonation, demeanor, pacing and the like and to the trial judge's superior ability to evaluate these considerations."), *cert. denied,* 526 U.S. 1009, 119 S.Ct. 1152, 143 L.Ed.2d 218 (1999). Finally, a federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been ob-

served by the state trial court, but not by them," and must "more than simply disagree with the state court" in order to reach a different result. *Id.* at 650 (citing *Marshall v. Lonberger,* 459 U.S. 422, 432–34, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)).

*Juror Segers*

■■■ With regard to juror Segers, a reading of the *voir dire* transcript reveals that she did answer some of the questions clearly and that her responses to questions about the death penalty were direct. The prosecutor's explanation for Segers being "equivocal" seems to be based on her statement that the death penalty was "a necessary *option*" and on her body language, i.e., visible signs of inattentiveness and hesitancy in cooperating with the process, none of which can be revealed by a review of the cold transcript.

However, the fact that the written transcript before the court does not reveal juror Segers' body language does not mandate a finding that the evidence fails to support the prosecutor's stated reasons for excusing juror Segers. In the context of challenges for cause based on juror inability to follow the law in death penalty cases, the United States Supreme Court has noted that reviewing courts must defer to the trial court's judgment, which is based on the recognition that sometimes it is just as important *how* something is said as *what* is said, and that a person's demeanor may not be readily gleaned from a cold record. *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144, *reh'g denied,* 478 U.S. 1036, 107 S.Ct. 24, 92 L.Ed.2d 774 (1986).

The prosecutor's explanation for why he struck juror Segers related primarily to Ms. Segers' non-verbal communication— that she was leaning far away from the table, that she did not respond to group questions, and that she had the worst body

language of all of the potential jurors. The prosecutor explained that during a break he had discussed with law enforcement representatives and the victim/witness coordinator the fact that juror Segers was leaning as far away from the prosecutor's table as was possible. The trial judge was in a position to witness juror Segers' body language also, and to make a determination based on his own observations whether the prosecutor's statement that juror Segers was inattentive had any objective basis. The court reiterates that the ultimate burden of proof is on the party making the *Batson* challenge. Accordingly, inadequacies in the record which preclude a determination of whether facts exist to support the prosecutor's reasoning work to Petitioner's disadvantage. *Caldwell,* 159 F.3d at 652–53. Petitioner has not established by clear and convincing evidence that there was no support for the prosecutor's reasons for excusing juror Segers.

*Juror Hairston*

 Petitioner next contends that the evidence does not support the prosecutor's statement that juror Hairston seemed confused at times and incapable of comprehending the questions. Petitioner contends that juror Hairston, "was clear on what the prosecutor was asking, her answers were clear and direct. . . . In no instance was Ms. Hairston 'evasive.'" (Petitioner's Corrected Br. at 27.)

During the *voir dire,* the following exchanges, among others, occurred between juror Hairston and the prosecutor:

MR. LANG: The fact that you have participated in this jury system before would not make it difficult to sit on this one. You could put all that aside and start fresh and clean the slate off and take this evidence and this law?

MS. HAIRSTON: There are different type cases. It was criminal, you know. Isn't it criminal when it's like assault?

MR. LANG: Was it in this courtroom?

MS. HAIRSTON: It's been too long to remember.

(State's Br., Ex. A2 at 46.)

MR. LANG: Anybody been to court with a close friend, family member, neighbor that has been charged with any type of criminal conduct? Okay, Ms. Hairston.

MS. HAIRSTON: What do you mean been to court before? If somebody asked you to come?

*Id.* at 53.

MR. LANG: Ms. Hairston. How do you feel about the death penalty?

MS. HAIRSTON: How do I feel about it? It's a shame that a person would do something to warrant the death penalty. I never have really thought about it seriously.

MR. LANG: Do you feel that the death penalty is a necessary part of the law?

MS. HAIRSTON: Yes, I do.

MR. LANG: Do you think it would be difficult for you to be on a jury that involved the death penalty?

MS. HAIRSTON: If it came to that point and we had enough evidence to warrant the death penalty, no.

MR. LANG: You understand this two phase thing again? The guilt/innocence phase of the trial and then the sentencing phase?

MS. HAIRSTON: Right.

MR. LANG: And as the judge explained earlier, first you will look at the guilt/innocence portion and then if the defendant is found guilty of first-degree murder you move on to the sentencing

phase. Do you understand that? The way it works?

MS. HAIRSTON: Right.

MR. LANG: If you were satisfied, Ms. Hairston, beyond a reasonable doubt that the defendant is guilty of first degree murder, do you feel you could find him guilty?

MS. HAIRSTON: (No audible response.)

MR. LANG: Do you want me to repeat that?

MS. HAIRSTON: Yes.

MR. LANG: If you were satisfied beyond a reasonable doubt, which is the legal standard the judge is going to tell you about that is the burden of proof that the State has, if you are satisfied beyond a reasonable doubt that the defendant is guilty of first degree murder, can you find him guilty?

MS. HAIRSTON: If I'm satisfied that he is from the evidence, yes, I could.

*Id.* at 81–83.

MR. LANG: What I'm getting at is if you have some kind of personal belief or something that would make it difficult for you to impose the death penalty . . . . Does everybody understand what I'm trying to say? Does anybody think that the—yes, ma'am?

MS. HAIRSTON: What did you say?

MR. LANG: What I'm saying is that this case involves the death penalty and as a possible option if the defendant is found guilty of first-degree murder. You understand that? We've been through that.

MS. HAIRSTON: Yes.

MR. LANG: But the fact that it is involved and I was asking everybody if they feel that maybe because they may have some misgivings about the death penalty itself, that during the guilt/innocence determination it would make it difficult to determine guilt/innocence of first degree murder or any other charges the judge instruct[s] you on?

MS. HAIRSTON: Are you trying to say would I believe the death penalty would affect our determination of whether the person was guilty or not and cause us to change our verdict because—

*Id.* at 96–97.

Based on these interactions, there was fair evidence in the record to support the prosecutor's assertion that juror Hairston was confused by some of the questions. The court further notes that the prosecutor gave another reason for striking juror Hairston—that she was a nurse and that he did not want the nurturing type on the jury.[5] The United States Supreme Court has made clear that "the second step of [the *Batson*] process does not demand an explanation that is persuasive, or even plausible" and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769 (where the prosecutor stated that he struck a juror because he did not like the way the juror looked, the way the hair is cut and the juror's mustache and beard looked suspicious to him, the Court held that the prosecutor's proffered explanation was race neutral and satisfied the prosecution's step two burden of articulating a nondiscriminatory reason for the strike and noting that "the wearing of beards is not a characteristic that is peculiar to any race.").

---

5. It appears that other nurses may have been left on the jury, but the prosecutor articulated multiple reasons for striking juror Hairston, and Petitioner has not shown that any seated white juror was similarly situated as juror Hairston on all relevant factors.

*Juror Clavijo*

 The prosecutor articulated race-neutral reasons for excusing juror Clavijo. In the first instance, the prosecutor responded to defense counsel's *Batson* challenge by observing, "I didn't even realize that Ms. Clavijo was Hispanic. I hadn't even looked at the juror questionnaire." (State's Br., Ex. A2 at 107.) The prosecutor noted that Ms. Clavijo had only lived in the county for four months, was single, and had not voted since 1989. The prosecutor was concerned that juror Clavijo did not have a sufficient stake in the community to warrant sitting on a death penalty case. The evidence supports the trial judge's finding that the prosecutor had articulated a race-neutral basis for his action and had not discriminated in jury selection on the basis of race.

B. Failure to apply third test of Batson

Petitioner further contends that the trial court did not correctly apply the three-prong test in *Batson* and that the state court's decision is therefore contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Under the three-prong *Batson* test, once the opponent of a peremptory strike has made out prima facie case of racial discrimination, the burden of production shifts to the strike's proponent to offer a race-neutral explanation. The trial court must then determine whether the strike's opponent has proven purposeful racial discrimination.

In this case, the trial court made a verbal finding that Petitioner.

[F]ailed to establish a prima facie pattern of discriminatory use of challenges on behalf of the district attorney but out of an abundance of caution the Court has asked the district attorney to articulate reasons and the district attorney

has articulated valid reasonable and satisfactory reasons for his use of challenges which are totally aside from race and the Court will deny the challenge under *Batson.*

(State's Br., Ex. A2 at 110–11.)

Petitioner contends that the trial court committed a *Batson* violation because "the trial court found only that the prosecutor had articulated race-neutral reasons for the strikes; it did not resolve the issue of whether the Petitioner had shown purposeful discrimination." (Petitioner's Corrected Br. at 28–29.) This court disagrees.

Petitioner raised this argument on direct appeal and the North Carolina Supreme Court held that "the trial court clearly found that the defendant failed to establish a *Batson* claim and specifically denied the defendant's challenge. Common sense, therefore, dictates that the trial court determined that the defendant failed in his effort to show purposeful discrimination, even without specifically stating so for the record." *State v. Lyons*, 343 N.C. at 14, 468 S.E.2d at 208.

 The North Carolina Supreme Court's finding that the trial court did apply the third part of the *Batson* test was not unreasonable. The trial court found the prosecutor's race-neutral explanations to be "valid," "reasonable," and "satisfactory." These findings are clear expressions by the trial judge that the prosecutor had acted in a non-discriminatory manner. Petitioner has not shown that the state court decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See also Evans v. Smith*, 220 F.3d 306 (4th Cir.2000) ("Like the [United States] Supreme Court, we refuse to impose stringent, detailed requirements as to how trial courts are to implement *Batson.*"), *cert. denied*, 532 U.S.

925, 121 S.Ct. 1367, 149 L.Ed.2d 294 (2001).

For the reasons set forth above, the court finds that Petitioner's Claim VI is without merit.

### CLAIM VII

In Claim VII of the Petition, Petitioner contends that the trial court committed constitutional error by failing to submit per N.C. Gen.Stat. § 15A–2000(f)(6), the statutory mitigating circumstance that Petitioner's capacity to conform his conduct to the requirements of the law was impaired. Petitioner raised this claim on direct appeal. The North Carolina Supreme Court addressed it and rejected it on the basis that petitioner offered no evidence at trial to support submission of the (f)(6) mitigator. *State v. Lyons*, 343 N.C. at 15–16, 468 S.E.2d at 210–11.

■■■ Petitioner argues that the trial court's "formalistic application of evidentiary rules to exclude critical evidence was contrary to and an unreasonable application of rules set forth in *Green* and *Lockett*." *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). The United States Supreme Court in *Lockett* and *Green* clearly established that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant's character, record, or the circumstances of the particular offense. *Lockett*, 438 U.S. at 604, 98 S.Ct. 2954; *Green*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). However, the *Lockett* and *Green* courts did not alter the Court's ruling in *Lashley* that "[n]othing in the Constitution obligates state courts to give mitigating circumstance instructions when no evidence is offered to support them." *Delo v. Lashley*, 507 U.S. 272, 277, 113

S.Ct. 1222, 122 L.Ed.2d 620 (1993). The constitutional question thus turns on whether the evidence supported submission of the requested statutory mitigating circumstance.

■■■ Petitioner contends that "extensive evidence" was available to prove that Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. (Petitioner's Corrected Br. at 38.) The court first notes that although Petitioner claims that "extensive evidence" was available to support submission of the mitigator, he fails in his brief to show what this alleged evidence is. The evidence at trial showed that Petitioner had average to above-average intelligence; that before and after the murder Petitioner did not appear to others to be intoxicated or disoriented; and that after the murder Petitioner ran back to the apartment where he had been before the murder, took off the sweatshirt that he was wearing during the murder, and started asking what time the news was coming on. (State's Br., Ex. A4, Tr. of Evidence Vol. III at 65, 93–94; State's Br., Ex. A5, Tr. of Sentencing Phase Vol. IV at 87.) During the sentencing phase of the trial Dr. Hoover testified that Petitioner suffered from bipolar disorder and anti-social personality disorder and from a severe conduct disorder as a very young child, ages two to three. (State's Br., Ex. A5 at 57.) Dr. Hoover further testified that Petitioner began drinking alcohol at age four and began to use marijuana at age six or seven and used crack cocaine at the ages of ten to twelve. *Id.* at 63–64. He stated that Petitioner has "such a lengthy substance abuse history that my only conclusion is that his judgment has been impaired from an early age." *Id.* at 65. However, Petitioner points to no evidence, and the court finds none in the record, showing that Petition-

er's personality disorders, his past drug and alcohol abuse, or any other factor impaired his ability *at the time of the murder* to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Accordingly, the court does not agree with Petitioner that "extensive evidence" was available to show that Petitioner's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the murder. Accordingly, the evidence did not reasonably support the statutory mitigator of diminished capacity and the trial court's refusal to submit it was not contrary to or an unreasonable application of federal law as established by the United States Supreme Court.

Petitioner also argues in Claim XIV of his Petition that he received ineffective assistance of counsel because trial counsel failed to develop "extensive evidence" that was available to prove this statutory mitigating factor. (Petitioner's Corrected Br. at 38.) Petitioner raised this claim to the state MAR court and the court determined that counsel's performance was not deficient.

■■■ At the state MAR evidentiary hearing, trial counsel Danny Ferguson testified that he and co-counsel Urs Gsteiger had attempted to develop diminished capacity as a mitigator at sentencing through Dr. Hoover but that it had not worked, presumably because there was simply not sufficient evidence to submit the statutory mitigator. (State's Br., Ex. P3, Tr. of MAR Hearing, at 43.) Moreover, the fact that Dr. David Michael Hattem (who testified at the MAR hearing) would have been willing to testify at trial to the (f)(6) mitigator does not render trial counsel's performance deficient. See *Poyner v. Murray*, 964 F.2d 1404 (4th Cir.) (mere fact that counsel did not shop around for psy-

chiatrist willing to testify to presence of more elaborate or grave psychological disorders does not constitute ineffective assistance of counsel), cert. denied, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Finally, there is nothing before this court to suggest that the jury would have found the (f)(6) mitigator had it been submitted, or that such submission would have caused the jury to recommend life imprisonment rather than death, particularly in light of the fact that the jury declined to find that Petitioner was under the influence of drugs at the time of the murder. Accordingly, the court finds that the state MAR court's determination that counsel's performance was not deficient was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

For the reasons set forth above, there is no merit to Petitioner's Claim VII and the ineffective assistance of counsel claim in Claim XIV regarding the statutory mitigator.

### CLAIM VIII

In Claim VIII of the Petition, Petitioner contends that the trial court committed constitutional error by refusing the defendant's request for a peremptory instruction on the statutory mitigating circumstance that the offense was committed while Petitioner was under the influence of a mental or emotional disturbance.

■■■ Petitioner does not argue this claim in his brief and states that he relies upon his Petition. Review shows that the claim has no merit. "Peremptory" instructions are creatures of state law, and are not constitutionally mandated. In any event, the jury *in fact* found as a statutory mitigating factor that Petitioner was under the influence of a mental or emotional disturbance, and Petitioner fails to *show*

how the trial court's refusal to give a peremptory instruction in any way prejudiced Petitioner. Petitioner's Claim VIII should be dismissed.

### CLAIM IX

In Claim IX of the Petition, Petitioner contends that the trial court's instruction that the jury must be unanimous in its answer on sentencing Issue Four was in violation of the Eighth and Fourteenth Amendments. Petitioner raised this issue on direct appeal and the North Carolina Supreme Court denied it.

The trial court offered four Issues to the jury in the sentencing phase. As to Issue Four, the trial court instructed the jury to answer:

> [D]o you unanimously find beyond a reasonable doubt that the aggravating circumstance found unanimously by you in issue one is sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?

(State's Br., Ex. A5 at 242.)

The court further instructed the jury:

> In deciding this issue, you are not to consider the aggravating circumstance standing alone. You must consider it in connection with any mitigating circumstances found by one or more of you. When making this comparison, each juror may consider any mitigating circumstance or circumstances that juror determines to exist by a preponderance of the evidence. After considering the totality of the aggravating and mitigating circumstances, each of you must be convinced beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in this case before you can answer the issue "yes." In so doing, you are not doing a mathematical formula. For example, three

circumstances of one kind do not automatically and of necessity outweigh one circumstance of another kind. You may very properly give more weight to one circumstance than to another.

> .... [I]f you are satisfied beyond a reasonable doubt that the aggravating circumstance found by you is sufficiently substantial to call for the death penalty when considered with mitigating circumstances found by one or more of you, it would be your duty to answer the issue "yes."

(*Id.* at 242–43.)

The record shows that after the jury deliberated for several hours, the jury asked whether its decision had to be unanimous on Issue Four. In response, the trial court instructed the jury that:

> [Y]our decision on issue number four does have to be unanimous. If you're unanimous—if all twelve of you find yes, then you would answer it yes. If all twelve of you find no, then you would answer it no and that should—that would answer the question on the follow-up question.

*Id.* at 254.

Petitioner contends that "this instruction violated the Due Process Clause and the Eighth Amendment because it shifted the burden of proof to the Petitioner, prohibited individual jurors from giving full weight to their found mitigation, and unconstitutionally coerced a verdict of death." (Petitioner's Corrected Br. at 32.)

 The clearly established federal law as determined by the United States Supreme Court is *McKoy v. North Carolina*, which held that a state may not preclude the sentencer from considering and giving effect to evidence of any relevant mitigating circumstance proffered by the defendant. 494 U.S. 433, 110 S.Ct.

1227, 108 L.Ed.2d 369 (1990). Thus, it is unconstitutional for a state to require a unanimous finding of a mitigating factor. *Id.* In *McKoy,* the Supreme Court struck down a North Carolina practice that required a capital sentencing jury to find unanimously the existence of mitigating circumstances. The Court held that the unanimity requirement limited an individual juror's consideration of mitigating circumstances and was therefore unconstitutional. The United States Supreme Court has further declared that in determining whether jury instructions violate *McKoy,* the question is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

▆▆▆ In this case, the court made clear in its instructions that the jury did not have to find unanimously the existence of a mitigating circumstance. The judge instructed the jury that:

> An individual juror may find that any mitigating circumstance exists by a preponderance of the evidence whether or not that circumstance is found to exist by all the jurors.
>
> . . . .
>
> If any one or more of you find by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the form. If none of you find this circumstance to exist, you would so indicate by having your foreman write "no" in that space.

*Id.* at 234–35.

Thus, there obviously is no "direct" *McKoy* error. Petitioner's attempt to dramatically extend *McKoy* must be denied for the reasons explained at length by the Fourth Circuit in *Green v. French,* 143 F.3d 865, 890 (4th Cir.1998), *cert. denied,* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999), *abrogated on other grounds, Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). There the Court of Appeals wrote:

> Green also seems to advance an independent but related argument of coercion based upon *McKoy v. North Carolina.* Under North Carolina law, although any recommendation made by the capital sentencing jury must be unanimous, a sentencing jury's failure to reach a decision within a reasonable period of time automatically results in the imposition of a life sentence. The jury is not, however, instructed of the consequences of such a deadlock, and if the jury asks about the consequences of deadlock, the court is required by state law to instruct the jury that "[your] inability to reach a unanimous verdict should not be [your] concern but should simply be reported to the court." Green contends that the failure to inform his sentencing jury of the consequences of a deadlock, combined with the instruction that any recommendation must be reached unanimously, coerced the jury into imposing the death penalty against its will in violation of *McKoy.* To the extent that Green in fact presses this argument, it is almost certainly waived, and it has not been exhausted in state court. In any event, it is without merit.
>
> In *McKoy,* the Supreme Court held that it violated the Eighth Amendment for North Carolina to instruct a capital sentencing jury that it must unanimously find from the evidence the existence of mitigating circumstances. In so holding, the Court reasoned that a jury instruction requiring unanimity in order to find the existence of mitigating factors

would permit one lone "holdout" juror to prevent the other jurors from considering mitigating evidence, and that such a scenario would violate the principle that "a sentencer may not be precluded from giving effect to all mitigating evidence."

The state court's conclusion that Green's sentencing instructions were not unconstitutionally coercive was not contrary to the *McKoy* case. Petitioner concedes that the verdict sheets in this case were in compliance with the dictates of the *McKoy* holding: "On its face, North Carolina's scheme satisfies the requirements of *McKoy* by allowing each individual juror to consider and give effect to mitigating evidence," "North Carolina has responded [to the *McKoy* decision] by reimposing the unanimity requirement at every stage of jury deliberations except the stage at which it was expressly forbidden."

Nor was the state court's conclusion that Green's sentencing instructions were not unconstitutionally coercive an unreasonable application of the *McKoy* case. Green's only argument under *McKoy* is, at best, that he was sentenced under a scheme that was inconsistent with the broader policies underlying *McKoy* because refusing to instruct the jury of the consequences of a deadlock, instructing the jury that whatever verdict it reaches must be unanimous, and requiring any sentence recommendation to be unanimous, will force the jury to deliberate "in the dark," and may coerce anti-death penalty jurors in the minority to back down and, presumably out of hopelessness, adopt the majority's recommendation in favor of death. This argument is so tenuously related to the actual holding in *McKoy* that we could not hold that the state court's decision to affirm Green's death sentence constituted an unreasonable ap-

plication of the clearly established principles of *McKoy*. In *McKoy*, the Supreme Court expressed concern that, if the jury could only consider mitigating factors that were found unanimously, then one juror could essentially impose the death penalty over the will of the other eleven. For example, all twelve jurors could find the existence of certain aggravating factors, and eleven of the twelve jurors could believe that there was a mitigating circumstance that was sufficient to outweigh the aggravating circumstance, but one lone holdout juror who refused to acknowledge the existence of that mitigating circumstance could force the entire jury to impose a death sentence. Petitioner, however, asks this court to do far more than remedy the type of anomaly invalidated by the Supreme Court in *McKoy*; petitioner asks us to hold either that a jury must be instructed that its failure to reach a unanimous verdict will result in the imposition of a life sentence, or else that the jury cannot be required to be unanimous as to any (non-deadlocked) sentencing recommendation that it does make. The "coercion" identified by petitioner is not that one lone holdout juror in favor of the death penalty may override the will of the other eleven jurors who would have voted against death, but rather, that one lone juror who is opposed to imposing the death penalty will feel "coerced" into going along with the other eleven out of a sense of futility because he believes that unanimity is required and knows it will be difficult or impossible to persuade his fellow jurors to change their votes. Green has not cited us any Supreme Court (or other applicable) precedent clearly establishing that a

jury must be instructed as to the consequences of deadlock where state law requires that a deadlocked jury automatically results in life imprisonment. Indeed, a court may reasonably refuse to instruct a capital sentencing jury as to the consequences of deadlock in order to promote jury deliberation. Furthermore, to the extent Green contends that the unanimity requirement itself is unconstitutional, Green's claim asks us to work a fundamental change in death penalty jurisprudence, and Green has not cited any case even suggesting that jury unanimity on the ultimate issue is unconstitutional. Indeed, as Justice Kennedy wrote in his separate opinion concurring in the judgment in *McKoy*, "[j]ury unanimity, it is true, is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community."

*Green*, 143 F.3d at 888–90 (citations and footnotes omitted).[6] Petitioner's argument to this court is unpersuasive in view of the reasoning set out above. Accordingly, the court finds that Petitioner cannot show that the trial court's instructions as to Issue Four were either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

**6.** In *Green*, the verdict sheets at issue provided:

Issue One: Do you unanimously find from the evidence, beyond a reasonable doubt, the existence of one or more of the following aggravating circumstances? . . .

Issue Two: Do you find from the evidence the existence of one or more of the following mitigating circumstances? . . .

Issue Three: Do you unanimously find beyond a reasonable doubt that the mitigating

The court finds that Petitioner's Claim IX has no merit.

### CLAIM X

In Claim X of the Petition, Petitioner contends that the trial court's instructions defining the burden of proof applicable to mitigating circumstances were unconstitutional because they used the "inherently ambiguous and vague" terms "satisfy" and "satisfaction" to define the burden of proof. (Petitioner's Corrected Br. at 35.)

Petitioner raised this issue on direct appeal and the North Carolina Supreme Court denied it. The trial court instructed the jurors as follows:

Now the defendant has the burden of persuading you that a given mitigating circumstance exists. The existence of any mitigating circumstance must be established by the preponderance of the evidence and that is the evidence taken as a whole must satisfy you, not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exists. If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the form.

(State's Br., Ex. A5 at 233–34.) Petitioner contends that the court's instructions were "an unreasonable application of clearly established United States Supreme Court law. There is a reasonable likelihood that the jury applied this instruction in a way

circumstances or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found? . . .

Issue Four: Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you? *Id.* at 889 n. 9.

which prevented consideration of constitutionally relevant evidence." (Petitioner's Corrected Brief at 35.) Petitioner cites *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

The court observes that the trial court gave a further instruction to the jury regarding the burden of proof:

> An individual juror may find that any mitigating circumstance exists by a preponderance of the evidence whether or not that circumstance is found to exist by all the jurors.

(State's Br., Ex. A5 at 234.) On review of the instructions given, the court is of the opinion that there was not a reasonable likelihood that the jurors interpreted the trial court's instructions to preclude consideration of mitigating evidence of Petitioner's background and character or the circumstances of the crime. The "satisfy" language used by the trial court was well-anchored to the "preponderance" language employed also. There is no reasonable likelihood that the jury misunderstood the instructions given to it. Thus, the state court's decision denying relief on this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. For the reasons set forth above, the court finds that Petitioner's Claim X is without merit.

## CLAIM XI

■ In Claim XI of the Petition, Petitioner contends that the trial court's instruction permitting jurors to reject submitted mitigation evidence was unconstitutional. The North Carolina Supreme Court rejected Petitioner's claim on the merits.

The United States Supreme Court has clearly established that the sentencer may not be precluded from *considering* mitigation evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). However, the Supreme Court has never held that a jury is constitutionally required to find that all submitted mitigating circumstances either exist or have mitigating value. Instructions to the jury must only provide a "vehicle for *reasoned response*" to mitigating evidence. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). There was no error in this case.

Accordingly, the court finds that the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The court finds that Petitioner's Claim XI has no merit.

## CLAIM XII

■ In Claim XII of the Petition, Petitioner contends that the trial court's use of the term "may" with regard to sentencing Issues Three and Four was unconstitutional because it made consideration of proven mitigation discretionary with the sentencing jurors. The North Carolina Supreme Court rejected this claim on direct review.

The Fourth Circuit recently rejected this precise claim in an unpublished opinion. *Carter v. Lee*, 202 F.3d 257, 1999 WL 1267353 (4th Cir.1999) (unpublished opinion), *cert. denied*, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 67 (2000). As the Court of Appeals concluded in *Carter*, this court concludes that there is no reasonable likelihood that the jury misinterpreted the challenged instruction. The trial court's instructions made clear that the jury was required to weigh the mitigating evidence against the aggravating circumstances and that each juror was to conduct that weighing based on the mitigating circumstances

found by that particular juror. The trial court's use of the word "may" did not create a reasonable likelihood that the jury misunderstood its task. Accordingly, the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court.

For the reasons set forth above, the court finds that Petitioner's Claim XII is without merit.

## CLAIM XIII

In Claim XIII of the Petition, Petitioner contends that the trial court violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments by denying Petitioner the right to examine each juror challenged by the State during death qualification prior to their excusal and by excusing jurors Petitioner was not permitted to question.

Petitioner has articulated no sufficient factual basis for his claim and has cited no federal law in support of his claim. The court is aware of no legal basis for Petitioner's claim, and an examination of the voir dire raises no federal constitutional issues. Accordingly, the court finds that Petitioner's Claim XIII is without merit.

## CLAIM XIV

In Claim XIV of the Petition, Petitioner contends that his trial counsel were ineffective for failing to develop and present at the sentencing phase of trial available mitigating evidence regarding defendant's mental disorders and positive aspects of his character. Petitioner raised this claim in his state MAR proceeding. The state MAR court found that Petitioner had not shown ineffective assistance because trial counsel's performance was not deficient.

The clearly established federal law regarding the right to effective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A violation of the right to effective assistance of counsel has two components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. 2052. To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

At trial, defense counsel relied solely on Dr. Hoover to introduce mitigating evidence of Petitioner's history of childhood abuse, abandonment, and personality disorders. Dr. Hoover testified that he interviewed eleven people other than Petitioner and collected information from nine sources that dated back to when Petitioner was approximately age eight. (State's Br., Ex. A5 at 54.) The people Dr. Hoover interviewed included boyhood friends of Petitioner, cousins of Petitioner, two women who knew Petitioner's mother when they were younger, Petitioner's grandmother, and Petitioner's brother. Dr. Hoover also reviewed school reports, correctional facilities reports, and mental

health treatment facilities reports. *Id.* at 82. From his interviews with people who knew Petitioner's mother when she was pregnant with Petitioner, Dr. Hoover adduced that the first six months of Petitioner's life "present a fairly consistent picture of a mother with problems including drug abuse, runaway behavior and multiple admissions for psychiatric treatment." *Id.* at 142–43. According to Dr. Hoover, four weeks after Petitioner was born he was left with a variety of people, ultimately to come under the care of his great aunt Bertha. *Id.* at 65. Dr. Hoover stated that he concluded from the interviews "that [Petitioner] was neglected and effectively abandoned at an extremely early age." *Id.*

Petitioner contends that he received ineffective assistance of counsel because trial counsel did not call any members of Petitioner's family to testify on Petitioner's behalf during the sentencing phase of trial. Petitioner contends that additional mitigating evidence could have been presented through family testimony and that the lack of testimony by family members gave the jury the impression that no one cared about Petitioner enough to testify on his behalf. (Petitioner's Corrected Br. at 37–38.)

In the state MAR proceedings, Petitioner's mother submitted an affidavit stating that she would have testified to the following on Petitioner's behalf: she was eighteen years old when she gave birth to Petitioner; she did not know she was pregnant until she was in her ninth month; she was going to school and working while she was pregnant and she and Petitioner's father separated the week before Petitioner was born; Petitioner was hyperactive as a child and took [Ritalin] for his condition; Petitioner was accident prone and lost consciousness several times when he was injured; Petitioner grew up in "rough" conditions and his grandmother was very violent with Petitioner, sometimes hitting him with broom sticks, wire hangers and switches; Petitioner was exposed to illicit drugs at an early age; and Petitioner's great aunt, one of his primary care givers, regularly supplied Petitioner with moonshine. (State's Br., Ex. L., Petitioner's MAR at Tab 8).

The affidavit of Petitioner's mother revealed that she would have testified to the following positive aspects of Petitioner's personality: Petitioner has made sacrifices for other people; when Petitioner was growing up money was tight and often Petitioner would not eat so that his brother court eat; Petitioner would let other people choose what they wanted to watch on television; Petitioner took the responsibility to feed several pets during his childhood; Petitioner gave his entire inheritance from an aunt to his paternal grandmother to help her pay an overdue mortgage bill so she could keep her house; and Petitioner gave his mother money so she could finance her second wedding. *Id.*

Petitioner's younger brother Damon also submitted an affidavit stating that he would have testified at trial that Petitioner had always been a good brother to him and one time rescued Damon from a neighborhood bully; Petitioner actively encouraged Damon not to pick up bad habits such as smoking or using illegal drugs; Petitioner encouraged Damon to take up boxing; Petitioner has always helped other people in his family and his friends and that he would do anything for Damon; and that Petitioner kept Damon from dropping out of school. *Id.* at Tab 9.

Petitioner's father Joseph Gregg submitted an affidavit stating that he would have testified at trial that Petitioner's mother drank alcoholic beverages and used marijuana during the early months of her pregnancy with Petitioner; that Petitioner's

mother never took care of Petitioner and instead left him in the care of different maternal relatives; that Petitioner's father did not see Petitioner on a frequent basis when Petitioner was growing up; the most of Petitioner's male role models were violent; that he loved his son very much; and that Petitioner was "a wonderful kid and is a wonderful person." *Id.* at Tab 10.

At the state MAR evidentiary hearing, trial counsel Danny Ferguson testified that he and his co-counsel Urs Gsteiger interviewed a number of witnesses and that they used Dr. Hoover in most of the interviews. (State's Br., Ex. P3, Tr. of MAR Hearing, at 35.) Ferguson stated that they originally planned to put on as many as eleven family members and friends to testify on Petitioner's behalf in mitigation, including Petitioner's mother, his brother, several cousins, and a few other people. *Id.* at 35–36. Ferguson testified that once they spoke in depth with these persons, they realized the witnesses could be very damaging to Petitioner because their testimony could actually serve to dehumanize Petitioner before the jury. Ferguson testified that trial counsel strategically decided to bring in mitigating evidence through Dr. Hoover, who would at least be more insulated from attack:

> But as it came down, Dr. Hoover had interviewed everyone and we had a problem with putting on these witnesses because these witnesses had some negative things to say as well as some positive things.

> It was our theory that by using Dr. Hoover to get into evidence the positive things that he had learned from the family he was fairly well insulated from the negative things that would be drawn out on cross examination and therefore we just basically were going to use Dr. Hoover for the whole thing. To bring out the positive things about [Petitioner]

as well as the psychological aspect. We were trying to humanize [Petitioner] that way.

*Id.* at 35–36. Ferguson stated that they decided that introducing mitigating evidence through Dr. Hoover "was the most practical way to present [Petitioner's] case without presenting the negatives." *Id.* at 36.

The MAR court determined that Petitioner failed to demonstrate ineffective assistance because Petitioner had failed to overcome the presumption that the trial counsel's trial strategy not to call more witnesses was appropriate under the circumstances. (State's Br., Ex. V, Mem. Order and Final Op., at 34, ¶ 18.) The court stated that Petitioner also failed to demonstrate the prejudice component.

On federal habeas review of the state MAR proceedings, the court must look to clearly established federal law regarding ineffective assistance claims as determined by the United States Supreme Court. To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052.

In applying the *Strickland v. Washington* rule, the United States Supreme Court has recently stated that a trial counsel's failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389

(2000) (deficient performance where counsel failed to return a phone call to prison minister offering mitigating testimony about defendant's prison behavior; never inquired into the defendant's background showing a "nightmarish" childhood including parents' imprisonment for criminal neglect and severe, repeated beatings by father; did not check the defendant's exemplary prison record; and failed to introduce available evidence that petitioner was "borderline mentally retarded"). However, in this case, trial counsel did not fail to investigate mitigating circumstances. In fact, trial counsel did investigate and did uncover certain mitigating circumstances about Petitioner's past, which trial counsel introduced, as the result of a strategical decision, through the testimony of Dr. Hoover rather than through Petitioner's family.

 The court concludes that Petitioner has not overcome the presumption that defense counsels' strategy was reasonable. Theoretically, testimony by Petitioner's family may have served to further humanize him before the jury in that it may have shown that family members cared about Petitioner's fate. However, the record reveals that Petitioner's mother gave damaging testimony about Petitioner at the state MAR hearing, as trial counsel had feared that she would at trial. For example, the evidence suggests that Petitioner's mother was in "total denial" of the dysfunctional manner in which Petitioner was raised. (State's Br., Ex. P3, Tr. of MAR Hearing, at 53.) Furthermore, she revealed on cross-examination that defendant was very good with pets but that he had once pulled the tail off a rabbit. Id. at 122.

With regard to Petitioner's brother Damon Lyons, counsel Ferguson testified at the state MAR hearing that he recalled that he did not put Damon on the stand because Petitioner did not want him to do so. Id. at 53. In any event, Damon's testimony also could have been damaging to Petitioner. Damon testified at the state MAR hearing that Petitioner was a good role model and that Damon was in close contact with Petitioner before the murder. However, Damon also stated that he had no idea where Petitioner lived. Id. at 138.

Finally, with regard to Petitioner's father Joseph Gregg, Ferguson testified that "we tried to reach the father at least by letter. I'm not sure if we had a phone number or not or whether it was disconnected or—but I wrote the father twice, I know, and I got no response." Id. at 54.

The court finds that trial counsel's decision to present mitigating evidence through Dr. Hoover was a reasonable and effective strategy considering the potentially damaging testimony which might have come from Petitioner's family members had they testified in person. Defense counsel was able, through Dr. Hoover, to bring in positive aspects about Petitioner but to keep out some negative information. Through Dr. Hoover's testimony alone, trial counsel successfully convinced the court to submit eleven mitigating factors to the jury. Accordingly, the court finds that the state MAR court's determination in this case was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See Bell v. Evatt,* 72 F.3d 421 (4th Cir.1995) (to succeed in ineffective assistance of counsel claim, defendant must overcome presumption that challenged action may be considered appropriate and necessary trial strategy under the circumstances), *cert. denied sub nom, Bell v. Moore,* 518 U.S. 1009, 116 S.Ct. 2533, 135 L.Ed.2d 1056, *reh'g denied,* 518 U.S. 1047, 117 S.Ct. 24, 135 L.Ed.2d 1118 (1996); *Turner v. Williams,* 35 F.3d 872 (4th Cir.1994) (where there is conceivable strategic advantage to decision not to

introduce certain evidence in mitigation, that choice is virtually unassailable on collateral review), *cert. denied sub nom, Turner v. Jabe,* 514 U.S. 1017, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995); *Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir.1991) (recognizing that "[t]he best course for a federal habeas court is to credit plausible strategic judgments" when evaluating ineffectiveness claims), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992).

For the reasons set forth above, the court finds that Petitioner's Claim XIV is without merit.

### CLAIM XV

In Claim XV of the Petition, Petitioner contends that his conviction for first-degree murder and death sentence were unconstitutional because they were based in part on the State's tendering of testimony of the co-defendant, Derick Hall, which the State knew to be false.

■ Petitioner asserts no factual basis to support this claim. Moreover, it appears that Petitioner has not previously raised this claim and presents no argument to show cause or prejudice to overcome his procedural default. *Breard v. Pruett,* 134 F.3d 615 (4th Cir.), *cert. denied, Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998).

Accordingly, Petitioner's Claim XV should be dismissed.

### CLAIM XVI

■ In Claim XVI of the Petition, Petitioner contends that the trial court committed constitutional error by permitting the State to cross-examine Dr. Hoover, who admitted that Petitioner suffered from a mood disorder characterized in part by explosiveness, concerning an incident in which he had attacked a prison guard dur-

ing a prior incarceration, where Petitioner had not put Petitioner's adjustment to prison in issue, had not raised an issue concerning Petitioner's good character, and where the court did not limit the jury's use of the evidence on the basis of the doctor's opinion.

Petitioner has articulated no argument to support a claim that the trial court's actions were contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The court finds no denial of fundamental fairness in the state court's evidentiary ruling. Accordingly, Petitioner's Claim XVI should be dismissed.

### CLAIM XVII

■ In Claim XVII of the Petition, Petitioner contends that the trial court committed constitutional error by instructing the jury to consider, as one of two convictions supporting the aggravating circumstance of prior conviction for a violent felony, Petitioner's conviction for robbery with a dangerous weapon, where the conviction for robbery with a dangerous weapon occurred after Petitioner's commission of the first-degree murder.

■ Petitioner argued on direct appeal that because the conviction for armed robbery was entered eleven days after he murdered the victim in this case, it was inadmissible as support for the (e)(3) aggravating circumstance as a "prior" conviction under N.C. Gen.Stat. § 15A–2000. The North Carolina Supreme Court held that as long as the prior violent felony occurred before the date the capital defendant committed murder and the capital defendant was convicted of the violent felony at some point before the capital trial, then compliance with the terms of subsection (e)(3) was achieved. *Lyons,* 343 N.C.

at 22, 468 S.E.2d at 214. When a petitioner's claim rests solely on an interpretation of state case law and statutes, it is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Here, Petitioner's claim rests solely on an interpretation of North Carolina law and Petitioner articulates no argument that the state court's interpretation of N.C. Gen.Stat. § 15A–2000 was contrary to or an unreasonable application of clearly established federal law. The court finds no fundamental unfairness in the state court's rulings. Accordingly, Petitioner's claim XVII is without merit as federal habeas corpus claim.

### CLAIM XVIII

In Claim XVIII of the Petition, Petitioner contends that the trial court's failure to prevent the "improper and inflammatory" argument of the prosecutor in the penalty phase denied Petitioner due process of law, the right to be free of cruel and unusual punishment, and the right to the assistance of counsel. On direct review, the North Carolina Supreme Court held that it reviewed each asserted instance of improper argument and found no basis to conclude that the trial court erred.

Petitioner contends that the following arguments violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments: the prosecutor's arguments that he was insulted by the mitigation in the case, that the victim called for justice from the grave, that the Petitioner must be prevented from committing the same crime again, the "unfair" argument of the Petitioner's sleep disorder, and the prosecutor's Biblically based argument. Petitioner contends that these comments "so infected the trial with unfairness as to make the resulting [recommendation of a sentence of death] a denial of due process" and a violation of the Eighth Amendment. (Petitioner's Corrected Br. at 39.) Petitioner contends that the North Carolina Supreme Court's denial of Petitioner's claim resulted in a decision that was contrary and an unreasonable application of the rules set forth in the Supreme Court cases of *Darden* and *Donnelly*. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

While Petitioner does not specify to which parts of the argument he refers, the court assumes they include the following arguments by prosecutors Lang and Spivey:

> The fact that he's anti-social and he is unable or unwilling to conform with our rules and laws and our norms that we live in a civilized society. That's supposed to have mitigating value. That is absolutely absurd I'd argue to you. To give credence to this pile of hogwash that you heard up here absolutely insults every one of us who had some troubles in a childhood, everyone of us who might have drank too much on occasion, everyone of us who might have had a mental disorder. It insults us that are able to conform our conduct and be responsible adults.

(State's Br., Ex. A5, Tr. of Sentencing Phase Vol. IV at 176–77.)

> The other thing that I asked you was could you render justice. Can you render justice? Steve Stafford lays out after the rain yesterday in the cold damp ground, dressed in his favorite suit, placed there by his family and his loved ones and from his grave he calls for justice.... He asks each and every one

of you to render justice and search for the truth.

*Id.* at 184–85.

If you render justice, you can keep this man from doing it again. You can keep this man from killing again.

*Id.* at 185.

How long are we going to let this predator continue to prey on our innocent citizens? How long are you going to let it happen? Once, twice, three times? There's only one way you can stop it and that's to vote for the death penalty in this case.

*Id.* at 189.

Listen to some of these other quotes [from telephone calls made to people in New Jersey who knew defendant]. He said that the man had a decreased need for sleep. I guess I'd have a tough time sleeping, too, if all I did was go out robbing and killing.

*Id.* at 201.

If they come up here and try to quote those [Biblical] verses, ask them about some other ones they don't quote like in Genesis. "Anyone who murders a man shall be killed for to kill a man is to kill one made like God." You know, don't let them come up here and try to use God's word to talk you out of doing your duty and if they try to do it, it ought to burn you up that they've attempted to do that.

*Id.* at 206.

 Misconduct by a prosecutor in closing argument may be grounds for reversing a conviction. However, the fact that comments are "undesirable or even universally condemned" is not sufficient. A habeas court reviews claims of prosecutorial misconduct to determine whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

*Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868. In determining whether a prosecutor's comments denied the defendant fundamental fairness, the reviewing court should consider: (1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the errors were isolated or repeated. *Arnold v. Evatt,* 113 F.3d 1352 (4th Cir.1997), *cert. denied,* 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998). The standard of review for prosecutorial misconduct in federal habeas cases is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868.

 Here, several of the prosecutors' comments may have been improper "personal expression[s] of [the] defendant's culpability." *Darden,* 477 U.S. at 179, 106 S.Ct. 2464. Furthermore, religiously based arguments are "universally condemned." *Bennett v. Angelone,* 92 F.3d 1336, 1346 (4th Cir.), *cert. denied,* 519 U.S. 1002, 117 S.Ct. 503, 136 L.Ed.2d 395 (1996). However, not every improper trial argument amounts to a denial of due process. *See Donnelly,* 416 U.S. at 647–48, 94 S.Ct. 1868. Reviewing the record in the light of the *Donnelly* and *Darden* standards, the court does not conclude that the prosecutors' arguments "so infected the trial with unfairness" that Petitioner suffered a violation of his due process rights, nor did they constitute cruel and unusual punishment or deprive Petitioner of assistance of counsel. Here, the prosecutors' arguments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent. The trial court instructed the jurors that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evi-

dence. (State's Br., Ex. A5, Tr. of Sentencing Phase Vol. IV at 245.) Finally, the weight of the evidence against Petitioner was overwhelming, reducing the likelihood that the prosecutors' arguments influenced the jury's decision.

The court further notes that in both *Donnelly* and *Darden*, the United States Supreme Court held that the prosecutors' arguments, although partially improper, did not deprive the defendants of any constitutional rights. After a careful review of the record, the court concludes that the state court's ruling was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court in *Donnelly* and *Darden*.

For the reasons stated above, Petitioner's Claim XVIII has no merit.

### CLAIM XIX

In Claim XIX of the Petition, Petitioner contends that his conviction and death sentence were unconstitutionally obtained because his counsel failed to establish a relationship of trust with him. Petitioner has not articulated a legal basis for this claim and the court finds none. Accordingly, Petitioner's Claim XIX should be dismissed.

### CLAIM XX

■ In Claim XX of the Petition, Petitioner contends that his conviction and death sentence were unconstitutionally obtained because trial counsel conceded Petitioner's guilt to felony murder and attempted armed robbery in counsel's opening statement.

The state MAR court determined that Petitioner's conduct was not deficient under the *Strickland* test. The court concluded that trial counsel's concession "was a reasonable tactical decision in light of the State's evidence in this case. The concession would engender credibility with the jury." (State's Br., Ex. V, Mem. Order and Final Op., at 35, ¶ 3.)

The court finds that the state court's conclusion is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. The record shows and the state MAR court found that both defense counsel discussed the matter extensively with each other and with Petitioner; that the attorneys knew that such a concession would take the case to a capital sentencing proceeding, but the evidence of a felony murder was irrefutable; and that the defendant agreed to the concession and entered it on the record on trial. (State's Br., Ex. A4, Tr. of Evidence Vol. III at 11–13.) "Counsel's concession of a client's guilt does not automatically constitute deficient performance." *Young v. Catoe*, 205 F.3d 750, 759 (4th Cir.) (where defendant was charged with capital murder for shooting the victim during an armed robbery, counsel was not ineffective for conceding defendant's guilt where evidence that defendant shot the victim was overwhelming), *cert. denied*, 531 U.S. 868, 121 S.Ct. 164, 148 L.Ed.2d 111 (2000). *Clozza v. Murray*, 913 F.2d 1092, 1099 (4th Cir.1990) ("Some remarks of complete concession may constitute ineffective assistance of counsel, but tactical retreats may be reasonable and necessary within the context of the entire trial, particularly when there is overwhelming evidence of the defendant's guilt."), *cert. denied*, 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991).

For the reasons set forth above, the court finds that Petitioner's Claim XX is without merit.

### CLAIM XXI

In Claim XXI of the Petition, Petitioner contends that his conviction and death sen-

tence were unconstitutionally obtained because of the failure of the trial court to request a hearing on Petitioner's competency. Petitioner asserts no argument in his brief to support his claim. He apparently bases his claim on an incident in the courtroom before the trial began in which Petitioner cursed at the judge and threw a Rolodex at him and guards removed Petitioner from the courtroom. The state MAR court found that Petitioner made no showing that he was incompetent; therefore, counsel was not ineffective for failing to request a hearing. Since Petitioner has asserted no argument in his brief to support his claim, it is not clear whether he raises a procedural due process claim on the ground that the trial court should have ordered a competency hearing *sua sponte* after the courtroom outburst or whether he raises an ineffective assistance of counsel claim on the ground that trial counsel should have requested a hearing after Petitioner's outburst in the courtroom, or both. It does not matter, however, because after a careful review of the record, the court finds that Petitioner has failed to establish the existence of any facts raising a "bona fide doubt" regarding Petitioner's competency to stand trial. Accordingly, a due process claim and an ineffective assistance claim would both lack merit.

■■■■ The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *Pate v. Robinson,* 383 U.S. 375, 384–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). A petitioner may make a procedural competency claim by alleging that the trial court failed to order a competency hearing after the defendant's mental competency was put in issue. To prevail, the petitioner must establish that the state trial court ignored facts raising a "bona fide doubt" regarding the petitioner's competency to stand trial. *Pate,* 383 U.S. at

384–86, 86 S.Ct. 836. The test for determining competence is whether "[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *Medina v. Singletary,* 59 F.3d 1095, 1107 (11th Cir.1995), *cert. denied,* 517 U.S. 1247, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996).

■■■■ In the state MAR proceedings, trial counsel Ferguson testified that after the outburst in the courtroom, counsel were able to calm Petitioner down so that he could return to the courtroom and behave appropriately for the rest of the trial. Defense counsel Ferguson stated that he never believed that Petitioner was incompetent. (State's Br., Ex. P3, Tr. of MAR Hearing, at 57.) Ferguson testified that "[Petitioner] was always able to communicate with us about the case. He seemed to always have an awareness and understanding of the functions of the various people in the court, the jury, the judge; he spoke quite well with us about the case." *Id.* Finally, Dr. Hoover did not testify that Petitioner was incompetent to stand trial or assist in his defense.

■■■■ The court finds that Petitioner was not deprived of due process since there was never a "bona fide doubt" as to his competency before the trial court. Furthermore, the court finds that trial counsel's decision not to raise competency claims at trial and/or on direct appeal was an eminently reasonable decision and Petitioner was not prejudiced by counsel's decision not to raise these claims. The state MAR court's decision rejecting this claim

was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

For the reasons set forth above, the court finds that Petitioner's Claim XXI is without merit.

*Petitioner's Motion to Amend to add a claim under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000)*

 Petitioner's motion for leave to file an *Apprendi* claim (Pleading no. 24) should be denied. *Apprendi* cannot have retroactive application to this case. *See United States v. Sanders,* 247 F.3d 139, 151 (4th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001). Further, an *Apprendi* claim would have no merit since the sentence Petitioner received did not exceed the statutory maximum for the crime identified in the indictment. *See United States v. Kinter,* 235 F.3d 192, 199 (4th Cir.2000), *cert. denied,* 532 U.S. 937, 121 S.Ct. 1393, 149 L.Ed.2d 316 (2001). Accordingly, Petitioner's motion to amend should be deemed as futile.

## CONCLUSION

For reasons set forth above. **IT IS RECOMMENDED** that the habeas corpus petition of Robbie James Lyons be denied and dismissed. The undersigned has not called for oral argument, finding that the written record, the arguments of counsel, and the legal precedents applicable to this case are clear, and oral argument would not be helpful to the court.

Jan. 18, 2002.